Whitaker, Judge,
delivered the opinion of the court:
The issue in this case is whether certain commodities shipped by defendant come within the classification of (1) “Buildings, Portable, NOIBN, Wooden or Wood and Iron/ Steel Combined & Transmitting & Receiving Sets Combined (ÁN/GRC-26A) ”, or (2) “Radio Mobile Communications Units, viz: Metal (Steel) Shells, containing permanently fixed Radio Receiving and Transmitting Sets.” If the former, then T.C.F.B. Tariff No. 38-8 applies; if the latter, then T.C.F.B. Section 22 Quotation No. 117-B, as amended, applies. The parties agree that if the first classification is correct, plaintiff is entitled to recover $5,195.78, but, if the latter, it is not entitled to recover anything.
*639 The first classification set out above accurately describes the commodity shipped. It was so described on the Government bill of lading, which was made out by the defendant.
The bill of lading, in further description of the commodity, refers to it as “Shelter & Radio Sets AN/GRC-26A”, or as radio sets “AN/GRC-26A.” Radio sets AN/GBC-26 are described in Army Technical Manual TM-11-264 as follows:
a. Radio Set AN/GRC-26 consists of a transportable assembly of equipment * * * providing facilities for transmission and reception of radio teletype signals on an FS (frequency shift) basis over a frequency range of 2 to 18 me (megacycles). * * * Shelter S-55/GRC, containing the communications equipment, is normally transported by a 2%-ton, 6x6 cargo truck (modified).
and shelter is described as follows:
shelter: Army-Navy Shelter S-55/GRC; radio equipment; assembled; rectangular w/bowed roof; wood framework, plywood inner lining, steel outside wall panels, canvas roof covering and steel underflooring. Thermal insulation throughout; 6 windows 14%" wd x 12% " h approx; 1 door 34" wd x 59'%" h w/window 24%" wd x II" h; 1 roof hatch 25%" x 22%"; includes ventilating blower, and fire extinguisher; has blackout shutters and screens, table and shelves for equipment, storage cabinet; U.S. Army spec 12-144.
The foregoing accurately describes the shelter and radio sets which were shipped. Defendant admits this and further admits that T.C.F.B. Tariff No. 38-8 would apply, except for the fact the Government was the shipper, and had been given a special rate under section 22 of 49 U.S.C., which, it says, applies to the shipment in question.
In order to secure a preferred rate, the Marine Corps wrote the Trans-Continental Freight Bureau on February 20,1952, as follows:
The Marine Corps is making regular shipments of Radio Mobile Communication Units, known as type AN/MRC-18, metal (steel) shells containing permanently fixed Radio Receiving and Transmitting Sets not on wheels, but may be moved from place to place by skid or loaded on trucks or freight cars by means of hoist or skids. They are for use as temporary radio stations. They may *640 be otherwise classified as huts or enclosed shelters, without wheels, having radio equipment permanently attached inside.
It is requested that the above described units which are similar by analogy, be included in the description of articles named in (Joint) TCFB Section 22 Quotation No. 117-A, and that the Government be accorded the same rates and privileges on the subject commodity as those named therein with effective date of 14 January 1952.
Later, on March 4,1952, in response to a request for additional information, the Marine Corps wrote the Bureau as follows :
The present basis of rates applicable to the article in question is second class with a carload minimum of 12000B, per item 34885 and Bule 17 of Consolidated Freight Classification No. 20. The approximate weight of this article is 12155 lbs and the dimensions 134%" long x 60%" high x 703/'' wide. The proposed rates are also to apply on equipment of replacement parts.
This is the Marine Corps’ description of the commodity which it wanted included in the articles to which TCFB Section 22 Quotation No. llt-A applied.
Before acting on the Marine Corps’ request, the Transcontinental Freight Bureau, on March 4, 1952, had issued T.C.F.B. Section 22 Quotation No. lll-B, which provided for rates on “Badio receiving sets, radio transmitting sets, or radio transmitting and receiving sets combined, mounted on freight automobile bodies or on freight automobiles or freight trailer vehicles, with or without power generating units.” Then, in response to the request of the Marine Corps set out above, it issued, on May 21, 1952, Amendment No. 1 thereto, which added the following commodity, as requested by the Marine Corps: “Badio Mobile Communications Units, viz: Metal (steel) Shells, containing permanently fixed Badio Beceiving and Transmitting Sets.”
So, since it is admitted the commodity shipped comes within the description contained in T.C.F.B. No. 38-8,' the issue in this case comes down to this: Does it also come within *641 Amendment No. 1 to T.C.F.B. Section 22 Quotation No. 117-B ? If so, tbe latter applies, since it is the contract rate.
We would find it quite difficult to determine this question were it not for the marked difference in the size and weight of the commodity shipped and that described in the Marine Corps letters of February 20, 1952, and March 4, 1952, in response to which Amendment No. 1 was issued. The commodity shipped weighed 8,640 pounds, and had a volume of 760 cubic feet; whereas the commodity described in the letter of March 4, 1952, weighed 12,155 pounds, and had a volume of approximately 328 cubic feet. The commodity shipped weighed approximately one-third less than the commodity described, and occupied about twice as much space on a freight car. The article described by the Marine Corps had a density of 37 pounds per cubic foot, whereas the article shipped had a density of 11 pounds per cubic foot, a difference of over 350 percent.
While the commodity shipped was a “Radio Mobile Communications Unit,” it was not the sort of “Radio Mobile Communications Unit” described in the above letters of the Marine Corps, in that its size and weight were greatly different. Both size and weight are of the essence in fixing railroad freight rates. Size affects the number that can be carried on a freight car, and weight determines the amount the carrier receives for carrying it, since the rates fixed are for so much per 100 pounds.
Since Amendment No. 1 was a contract rate, authorized by 49 U.S.C. section 22, it should be held to be limited to the character of the article described by the party requesting the rate. Where the article shipped is materially different from the article described, it must be presumed that it was not intended by the contracting parties that the rate issued should apply to it; otherwise, the defendant would have been guilty of a gross misrepresentation. The article in question differed quite materially from the article described by the Marine Corps in its request for its inclusion in the list of articles to which T.C.F.B. Quotation No. 117-A applied. This rate is, therefore, inapplicable.
*642 The parties have agreed that if we decide the rate claimed by plaintiff is the applicable rate, plaintiff is entitled to recover $5,795.78. We do so decide. Judgment in that amount will be entered for plaintiff.
It is so ordered.
Durfee, Judge; Laramore, Judge; and JoNes, OMef Judge, concur.
Davis, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a California corporation, is a common carrier by railroad in interstate commerce over its own lines and jointly with other carriers.
2. During 1952 plaintiff, as the final and delivering carrier and in conjunction with its connecting lines, transported from Chicago, Illinois, to Oakland, California, and from Bristol, Pennsylvania, to San Francisco, California, shipments described on Government bills of lading as “Buildings, Portable, NOIBN, Wooden or Wood and Iron/Steel Combined & Transmitting & Receiving Sets Combined (AN/ GRC-26A) ”, each weighing 8,640 pounds with a volume of 760 cubic feet.
3. Upon the completion of these transportation services, plaintiff, as the delivering carrier, billed defendant and was paid freight charges based upon the rates applicable to “Portable Buildings, Wooden, or Wood/Steel Combined.”
4. Subsequently, the General Accounting Office, after audit, stated overpayments on these shipments by applying the rates pertaining to “Radio Mobile Communications Units, viz: Metal (Steel) Shells, containing permanently fixed Radio Receiving and Transmitting Sets.” Adjustments of these stated overpayments were made by defendant by deductions from charges otherwise due plaintiff on subsequent bills of the plaintiff.
*643 5. The sole remaining issue in this case is the question of which of two rates is applicable to the article involved in the above-described shipments.
Plaintiff claims that the charges should be based on the second-class rate applicable to “Portable Buildings” under combination Bule 18 of C.F.C. No. 20 as applied to Items 8435 and 16080 of T.C.F.B. Tariff No. 38-8.
Defendant claims, in accordance with the above-stated action of the General Accounting Office, that the charges should be based on T.C.F.B. Section 22 Quotation No. 11T-B, as amended.
6. The parties have agreed that if the court decides that the applicable rate is that claimed by plaintiff, then plaintiff is due the sum of $5,795.78; but that if the applicable rate is that claimed by defendant, then plaintiff is due nothing.
7. On March 4, 1952, the Trans-Continental Freight Bureau issued, for the benefit of defendant’s Army, Navy, Marine Corps, and Air Force, T.C.F.B. Section 22 Quotation No. 117-B which provided rates on “Badio receiving sets, radio transmitting sets, or radio transmitting and receiving sets combined, mounted on freight automobile bodies or on freight automobiles or freight trailer vehicles, with or without power generating units.”
On May 21, 1952, Amendment No. 1 to this Section 22 Quotation added the following to the covered list of commodities : “Badio Mobile Communication Units, viz: Metal (steel) Shells, containing permanently fixed Badio Beceiving and Transmitting Sets.”
All of the Government bills of lading involved in this case were issued in June or August 1952.
8. The above-mentioned Amendment No. 1 was issued as a result of negotiations between the defendant’s Marine Corps and the Trans-Continental Freight Bureau. By letter dated February 20, 1952, the Assistant Transportation Officer of the Marine Corps wrote to that Bureau in part as follows:
The Marine Corps is making regular shipments of Badio Mobile Communication Units, known as type AN/MBC-18, metal (steel) shells containing permanently fixed *644 Eadio Eeceiving and Transmitting Sets not on wheels, bnt may be moved from place to place by skid or loaded on trucks or freight cars by means of hoist or skids. They are for use as temporary radio stations. They may be otherwise classified as huts or enclosed shelters, without wheels, having radio equipment permanently attached inside.
It is requested that the above described units which are similar by analogy, be included in the description of articles named in (Joint) TCFB Section 22 Quotation No. 117-A, and that the Government be accorded the same rates and privileges on the subject commodity as those named therein with effective date of 14 January 1952.
9. By letter dated March 4, 1952, in response to a request for additional information concerning radio mobile communications units to be included in the pertinent Section 22 Quotation, the Assistant Transportation Officer of the Marine Corps further stated as follows:
The present basis of rates applicable to the article in question is second class with a carload minimum of 12000E, per item 34885 and Eule 17 of Consolidated Freight Classification No. 20. The approximate weight of this article is 12155 lbs and the dimensions 134%" long x 60%" high x 70%" wide. The proposed rates are also to apply on equipment of replacement parts.
10. By letter dated November 28, 1956, the General Accounting Office wrote to the Marine Corps, referring to one of plaintiff’s bills involved in this case, and stating in part as follows:
Since commodity description shown on each of the bills of lading involved include the words “wooden or wood & steel combined” and the wording in Amendment No. 1 to Quotation TC 117-B reads, “Metal (steel) Shells”, please advise if there is any correspondence leading to the issuance of Quotation 117-B or Amendment 1, thereto, that would establish that it was intended to cover the commodity shipped in this instance.
If there is a difference between the commodity shipped and the commodity contemplated by the description as shown in Quotation 117-B or Amendment 1 of the Quotation it would be appreciated if you would furnish this office with an illustration or description of the *645 various types of shelters used in connection with these radio sets.
By letter dated April 3, 1957, the Marine Corps replied to the foregoing letter and stated in part as follows:
* * * you are advised that there is no difference between the commodity shipped and the commodity contemplated by the description as shown in Amendment No. 1 to Quotation TO 117-B.
11. Each of the Government bills of lading in this case, in connection with the description of the articles to be shipped, makes reference to either “Shelter & Radio Sets AN/GRC-26A” or radio sets “AN/GRC-26A.”
Radio sets AN/GRC-26 are described in Army Technical Manual TM-11-264 as follows:
a. Radio Set AN/GRC-26 consists of a transportable assembly of equipment * * * providing facilities for transmission and reception of radio teletype signals on an FS (frequency shift) basis over a frequency range of 2 to 18 me (megacycles). * * * Shelter S-55/GRC, containing the communications equipment, is normally transported by a 2%-ton, 6x6 cargo truck (modified).
The shelter is described as follows:
shelter: Army-Navy Shelter S-55/GRC; radio equipment; assembled; rectangular w/bowed roof; wood framework, plywood inner lining, steel outside wall panels, canvas roof covering and steel underfloor-ing. Thermal insulation throughout; 6 windows 1414" wd x 12%" h approx; 1 door 34" wd x 59%" h w/ window 24%" wd x 17" h; 1 roof hatch 25%" x 22%"; includes ventilating blower, and fire extinguisher; has blackout shutters and screens, table and shelves for equipment, storage cabinet; U.S. Army spec 72-144.
12. The shelter part of the article involved in the shipments in this case is fabricated of steel and plywood. Five sides of the shelter, that is, the two side walls, the front and rear walls, and the floor or bottom, have steel exteriors. The roof is constructed with a canvas outer covering, which is attached to a layer of plywood which in turn is fastened to wooden bows. Underneath these bows is fastened a steel screen, similar in wire size and mesh to ordinary house *646 screens, and this screen is extended sufficiently to be soldered to and along the top of all four sides of the shelter. Another layer of plywood is fastened beneath the screen to complete the roof installation.
The shelter has a steel door and six windows. The windows are provided with screens and also steel blinds for blackout purposes. A hatch opening in the roof also has a screen and a steel covering.
The inside frame of the shelter is primarily wood, with some reinforcing steel members. The internal covering of the shelter is plywood, with a metal screen also placed in the floor, with a linoleum or mastic floor covering.
The shelter includes appropriate furniture and fixtures, as stated in the specification quoted in finding 11, and fluorescent or incandescent lighting.
The purpose of the screening, together with the external steel construction, was to provide a continuous or unbroken metal shielding against any radiation from sources outside the shelter, which would interfere with the operation of the radio equipment contained in the shelter.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is, therefore, adjudged and ordered that plaintiff recover of and from the United States the sum of five thousand seven hundred ninety-five dollars and seventy-eight cents ($5,795.78).